Your Honor, I'm Assistant Defender Levi Harris and I'm here today on behalf of my client, the appellant, Mr. Eric Hill. At his jury trial for first degree murder, Eric Hill was denied his Fifth Amendment rights when the court allowed the state to admit Mr. Hill's videotaped statement even though the police repeatedly ignored his invocations of silence. And Mr. Hill was denied his Sixth Amendment right to effective assistance of counsel when his attorney insisted that the jury be to watch most of the 11 minutes of video in which Mr. Hill requested to remain silent. On these basis, we ask the court to reverse Mr. Hill's conviction and remand for a new trial. Now, Your Honor, we'll note there are two additional issues in the briefs, but I'm going to confine it to these ones I've spoken of. So first, Mr. Hill's Fifth Amendment right to silence was violated when the state got to admit the video of his police interrogation even though the interrogating officers failed to scrupulously honor his repeated requests to remain silent. So about an hour and five minutes into his interrogation, Mr. Hill began indicating by word and deed that he wanted the interview to end. He starts saying, I want to go home, I want to go home, and begins to stand up. They tell him to sit down. About four minutes after that, he begins to be more adamant. And it's not just at that point that he wants to go home or shifting in his seat to get up, but he starts saying things like, I've got nothing else to say. I've got nothing else to say. And not only did the police hear him, but one of the officers repeats this back to him. You have nothing else to say? Well, that's not going to fly. So he goes on like this for the better, so from about 109 to 116 in the exhibit. So for about seven minutes, he says, I'm through with it. I'm done. I don't want to talk, et cetera. And the officers just keep interrogating him. So this finally stops about an hour and 16 minutes in where they say, okay, we're going to leave the room and be gone for a minute. So that happens. The officers did not scrupulously honor his invocations to remain silent. We know from Michigan v. Mosley and that line of cases that once silence has been invoked by a defendant, interrogation can only be resumed if the officers have scrupulously honored the suspect's right to remain silent. There are several factors. These include whether the police immediately halted the interrogation after the suspect's initial invocation. Well, as we just discussed, that didn't happen. Another factor is whether a significant amount of time elapsed between the interrogations. In this case, the answer is no again. It's 42 and a half minutes. We were able to find no case in Illinois or the U.S. Supreme Court where a court said 42 and a half minutes was enough to sort of, they don't use the word attenuate, but to sort of break the error there. Another factor is whether a fresh set of Miranda warnings has been given to the suspect before the second interrogation. In this case, again, no, it didn't happen. They told him, no, we can't talk to you. We can't tell you anything unless you agree to talk to us. They reminded him of that, but they didn't re-Mirandaize him and tell him about his other rights. They didn't tell him, hey, if you start talking to us again, you're always free to stop or request an attorney at any time. So you think after the 42 and a half minutes, they should have re-Mirandaized him? Yes, Your Honor, at the very least. Other factors include whether the second interrogation included a different crime, involved different officers, or took place in a different location. We know that none of those three things happened here. So none of the factors that have been sort of outlined by Mosley in those cases was present here to sort of let the state off the hook. Letting these statements into Mr. Hill's trial rewarded the officers for ignoring his invocations of silence and in fact badgering him to keep talking. Now, the state says that Mr. Hill is the one who re-initiated the conversation after 42 and a half minutes, and the officers came back to say you're about to be charged. But a couple problems with that. One, that analysis only matters if the officers have scrupulously honored his invocations to remain silent in the first place. The second problem with that is that under the Oregon versus Bradshaw plurality that has been adopted as sort of a law in Illinois, the state has to show, the state has to show, both that Mr. Hill is the one who re-initiated further discussions, unprompted, he hasn't been tricked, he hasn't been badgered. He's the one who re-initiated and that there is a fresh Miranda waiver that shows that this statement is knowing and voluntary. Neither of those things was present here. Not only that, but the state bears the burden once the error is shown of showing beyond a reasonable doubt that the error was not harmless. Justice Scalia wrote in Salt Lake versus Louisiana that the test is not whether my client would have been convicted anyway in some theoretical trial. The question is whether the jury that actually sat in this trial was affected by this and whether the state can show beyond a reasonable doubt that what came in here didn't matter. Let me ask you a question. Yes, Your Honor. What did come in was continual denial of responsibility. How does that harm your client? Well, Your Honor, it harms the client in this way. It's three and a half hours after this all took place, or actually about two hours once you factor in the 42 and a half, of the police saying you did this, you did this, you're lying. I can smell a lie like a fart in a car. You're never going to go home. Your kids are going to be looking at you behind glass. You're eating your last cheeseburger. And he's sitting there saying, you know, I didn't do this, it wasn't me, etc. But what the jury is able to see for all these hours is police accusing my client and my client not owning up to responsibility. Okay. So it's really the actions of the police that were prejudicial to your client. Because that's what the jury kept seeing. It's the actions of the police, but it's also, Your Honor, his statements kept shifting. You know, there's that line, I think it's in United States v. Hale, that even if it's not what we would say is a confession or an admission, the state would obviously not have put this into evidence if it thought, hey, this is going to be really great for Mr. Hill. Let's get this in front of the jury and let them see Mr. Hill deny responsibility. Obviously, this is prejudicial. You sit and watch law and order when the cops are accusing somebody. You're like, that guy's guilty. We know this just from television, from everyday life. Not the legal world. That's why I thought perhaps they wanted it in is because the police were, by inference, making him guilty. That's why the state did? Yeah. Well, we have to ask the state exactly why. What the state knew is that looking at the whole thing as a whole, it made my client look bad and it made my client look incredible. In fact, it undermined his credibility. Would that make anyone that's in interrogation look guilty of something? Your Honor, it would. And we wouldn't have a problem with that if he hadn't invoked his Fifth Amendment right. If this were a perfectly valid interrogation, if they had stopped, for instance, when he invoked his rights and did what they needed to do and waited a certain amount of time to re-mournize him, of course you can bring this in. Of course it makes him look bad. That's valid evidence and the state has every right to bring it in. That's not what happened in this case. No, no. What I'm saying is you say by him denying it made him look guilty. Well, then anybody they called in there would deny it and they would look guilty. Is that what you're saying? I'm not saying necessarily that, although I do think that most people, this is the horror of the record, this is just my common sense of it, most people would think if you haven't done something wrong, you're not going to get called out at the police station and questioned in the first place. Be that as it may, what happened in this case, this interrogation definitely made the client, my client, look unbelievable, unworthy of belief, untrustworthy, and by implication, guilty. You know, I have a question for you that's maybe totally out of bounds, but how did the state ever prove that your client fired the gun in this case? Your Honor, the only evidence that they have is the dying declaration of the victim. Right. So, go ahead. I'm sorry, that's a statement. I'm wondering, there was no gun, right? Right. How did they ever prove he shot other than the dying declaration? Well, I think the dying declaration, that's their case. So, you would say it's a closely balanced case? Your Honor, I would say that, and that's not to say that the victim was a liar, and we talk about that in our brief. The reason we let dying declarations in, I think, historically, is that you think, if I'm getting ready to meet my maker, I don't want to accuse somebody of, you know, I don't want to accuse somebody of a mortal sin. I don't know whether that religious background still holds, but we believe that a dying declaration is going to be truthful to the extent that the witness is able to make that. That doesn't say that the powers of observation on the victim's part are heightened by the sense of impending death. Okay. All right. We only have a few minutes after closing counsel. Okay. Is it Mr. Miller? Yes. Okay. Mr. Miller. May it please the Court, counsel. My name is Max Miller, and I represent the people of the state of Illinois. The defendant was convicted following a jury trial and raised four issues on appeal. Regarding the first issue, the trial court did not air its denial of the defendant's motion to suppress. The defendant argues about 20 separate instances of what they say are invocations. To place these in context, we should understand that the defendant first came to the police station under the fact that it was an interview. He was not forced there, although they did have probable cause to arrest as it goes on. However, so he was moranized. They sit down, they say, you know, you have the right to remain silent. That means you don't have to talk to us. Do you understand? He said, yes. He said, what does that mean to you? He says, I don't have to talk to you. He says, okay. So all of these supposed invocations come after this fact. But an invocation that takes place after a proper Miranda has to be unambiguous and unequivocal. Because this started as an interview, any time that he said that he wanted to go home, that's the definition of ambiguity. Because he thinks maybe I can just walk out of here right now. And they answer him. They say, no, you can't go home. What about I've got nothing else to say? I've got nothing. So any of the instances where he says I have nothing else to say are always accompanied either by continued denials, explanations, expletives in some cases, and continued conversation. It's never as if he says I have nothing else to say and then he stops talking and it's just over. And so we believe that any of those are true. And in that way, it is certainly equivocal that he says I have nothing else to say. Do you have nothing else to say for that particular question? Or are you saying that you're done talking? That encompasses most of the invocations. Now, there are two that the state agrees are actual invocations, and that's when he said, you know, I'm done talking. That's very clear. It's important to note that three minutes passed between these two invocations. That came up in the motion hearing on a motion to suppress. They didn't hear the first one. If you read a transcript, it is clear that he said, you know, I've got nothing else to say. However, if you listen to the conversation as it was going, like there's mumbling, he's cussing. There's three minutes that elapsed in this time. Nothing important is said. And when they hear him say I have nothing else to say, they end the interview immediately. They're out of that room in under a minute. And he waits for 40 minutes. Agent Coke testified that during that time they were arranging to have him taken to St. Clair County Jail. He knocks on the door to have a restroom break. They take him out. They bring him back in. Agent Coke says, we didn't talk in the hallway, correct? He says, no, we didn't. He goes, by the way, and he goes, I can't talk to you. I'm not able to talk to you. You have, I invoked your right to remain silent. And the defendant says, well, I want to say, and they kind of had a little exchange about he said that, you know, he wants to say that he's innocent. He had nothing to do with the murder. And what the agent Coke does, he says, okay, sit down, Eric. Sits down. He says, look, you have invoked a constitutional right to remain silent. He said, are you saying that you still want to talk to me? He said, yeah, I want to talk to you and say that I didn't have anything to do with this murder. But that's reinitiating the conversation. What he has done. Is the law on reinitiation that he's required to give a memorandum before he allows reinitiation? The two things that were cited by the defendant in the reply brief was that, excuse me, that he, the state must establish that he reinitiated the conversation and that he knowingly, intelligently waived the right he had invoked. So it doesn't, my understanding was that there is, the state's understanding is not that there is a requirement of all the memorandum rights, just that they discussed the fact that he had invoked his right to remain silent. They told him that. And then they said, you still want to talk to us anyway. And Agent Coke is very scrupulous in not engaging in this conversation until he gets an affirmative yes, you do want to talk to me. Right. But the whole purpose of Miranda and the law that seems to emanate from Miranda is a knowing and voluntary waiver of your right to not remain silent. Those key words, knowing and voluntary, that's all over Miranda, isn't it? Absolutely, Your Honor. So my question to you is, how do we get a knowing and voluntary waiver once he reinitiates? How does the state meet its burden? Just by one question? So you want to talk to me? Well, I think for the fact that this is not, and this is why the state did not go through the factors of the scrupulously honored, because this is not two consecutive interviews that were conducted by the state as if first interview failed and wait a little bit and now we're coming back. This is the defendant on his own initiative trying to reengage the initial conversation. So I wouldn't say that the Miranda rights that he was read that made the interrogation acceptable, that whatever he said was voluntary and knowingly, and there is the Miranda form and the very specific nature in which he says that. Despite the 42-minute interruption where the officers concede he invoked, you believe this is still all one conversation? Absolutely. And another reason for that is the fact that not enough time has passed that would even be acceptable, as the Supreme Court has said, for a second interview to take place. What has the Supreme Court said about that? Time period. I'm not sure what the exact time period is. You said as the Supreme Court has said. Sure. In what case? I'm sorry, Your Honor. If you're going to claim the Supreme Court said something, you better tell me when you are. I apologize. I was just referencing what you were talking to the appellant. It's time to ask questions. I don't know if you've appeared in front of me before. Ms. Campbell, I'll tell you. Go ahead. I'm sorry. So in that way, we believe that the scrupulously honored fact does not apply because the time elapsed is just one continuous interview. However, if the court believes that this should be suppressed, the State still maintains that this case was proven beyond a reasonable doubt regardless of the video, first noting that the video contains no confession that he killed Marcus, and it doesn't even contain a confession that he was at the scene at the time. However, the State did have the 911 dispatch testify that Marcus Harris called 911, that he said that the police shot him. Officer Boyd was on the scene. He also reinforced that story by saying that Marcus Harris told him specifically on the scene that. Harris's brother testified the phone that called 911 was, in fact, Marcus's phone. Defendant was identified as Little E by two witnesses, one of whom saw the defendant Marcus associating with each other even if they were peers. The employee of track phone testified that the number belonging to the defendant received two calls from Marcus Harris's phone right before this happened. Detective Leibarger testified that the phone belonging to Marcus Harris had the defendant's phone number in it as Little E. And Dr. Graham testified that gunshots were the death of Marcus Harris. So taking the dying declaration into consideration, which is powerful evidence that, you know, in his last moments he was saying that this is who shot me, and we can trace that from his phone, that this is the person that he was concerning. The case is proven even without this video because the video, as the court has noted, does not contain any of that. Are there any questions? Even if you can show that he was guilty beyond a reasonable doubt based on the evidence, there's still a prejudice issue that would have to be overcome, right? I mean, if he was prejudiced by the video coming in, despite what evidence you have, what would be the result of that if we found that was prejudice? My understanding, well, my understanding of the harmless error is that, you know, upon examination of the entire record, that whether the defendant would have been convicted regardless. So I wanted to make sure that you were talking about plain error. So they didn't preserve this issue for review at the time, right? Well, I believe they preserved it. I believe the only issue that was not properly preserved was the sentencing factors. So the reason you're talking to us about plain error is in case what? Well, I was just talking about harmless beyond a reasonable doubt. Okay. Excuse me. If I misspoke, I apologize. I thought you just said plain error, but that's okay. I'm clear. Okay. For the second issue regarding ineffective assistance of counsel for not having it redacted, obviously look at the Strickland standard, which is reasonably effective assistance considered under the circumstances. The State believes that it was very beneficial to the defendant to have this video admitted, mostly for the same reason that it was not prejudicial in that it contained no confession, not only that he did not shoot the defendant, but that he was not at the scene at the time. And you also see the behavior of the police officer. So you have the defendant who is consistent in his denials despite this behavior by the police officer, and a jury could look at that and just as soon say, well, look, the defendant's behavior during this interrogation is because of this. Now, if you redact the video, it does become more confusing. There are appropriate situations where it should be redacted, but surely trial counsel should be able to make those decisions as long as they're reasonable. And to say that no trial counsel would have let that in, that, you know, that the defendant was trying to supposedly in the interview the police officer. I'm going to put you on the spot for one minute, although I put you on the spotlight. Are you aware of any new U.S. Supreme Court case that now pertains to the Strickland factors or redefines them? I am not, Your Honor. Okay. I apologize for that. No, no, don't apologize. I'm not sure, but I thought I saw a Bar Journal article on a new U.S. Supreme Court case that now redefines Strickland. I'll have to look that up, but that's my issue, not yours. Thank you very much. I thought maybe you could be helpful. I apologize, Your Honor. I don't know. Thank you. Okay. Your Honor, let me just briefly address what counsel said about Issue 2. When we get to Issue 2, we're talking about ineffective assistance of counsel. There's no question for purposes of Issue 2, there's no question that the rest of the tape can come in. So we're talking about, you know, at least two hours, two and a half hours of interrogation. When we're talking about Issue 2, what the defendant is saying is the issue is that counsel requested those 11 minutes of him invoking his right to silence in the tape that went to the jury. So him saying, I want to go home, I'm done talking, I don't want to talk no more, I got nothing to say, leave me alone, all of that, counsel said, yes, the jury needs to hear that. So there was no purpose for that. You know, the state says, well, it was helpful to hear his denials. He had two and a half hours of denials that come after that if that's what you want to get in front of the jury. There's no reason to have those invocations in, and in fact, we know that's why the state can't use them. The state was willing here to take them out. The court said, I think these should come out. Defense counsel said, no, I want them in. So we say for purposes of Issue 2, that was ineffective. Back to Issue 1, counsel said that there were only two invocations, and the state honored those once it heard the second one. You know, a familiar phrase in our day and age seems to be fake news. I think that's fake news. You know, he starts saying at about an hour and nine minutes in, I got nothing else to say, I got nothing else to say. Boom, that's end of discussion. They need to stop the interview right there. But instead, what do they do? They shift the burden to him and say, you got nothing else to say? You better come up with something, man, because that's not going to fly. He says, I'm through with it. He says, I'm through with it. I don't want to talk no more. This goes on, like I said, for about seven minutes before they finally stop. So it's just not true that they stop after they heard the second time. Also, by him saying, I don't want to talk and it being ignored for seven minutes, why would he think that he legitimately has a Miranda right to silence? If he invokes and invokes and does everything that he knows how to do as a layperson to stop the interview and they don't honor that, why should he think that that right that they just told him about is legitimately his? When we go to considering the totality of the circumstances for the state's argument that while he re-initiated, and one of the things to look at whether he's knowingly and voluntarily waived his Miranda rights for that re-initiation purpose, totality of the circumstances. Well, if they've ignored him for 11 1⁄2 minutes while he's saying, I don't want to talk anymore, I want to go home, I'm done, et cetera, that's part of the totality of the circumstances that we need to look at. Does he really know what's going on at that point that he's having this colloquy back and forth with the officer that ended up in two and a half more hours of interrogation? The state also says that all that is needed in this re-initiation analysis is whether there's been a revocation of the right that was invoked. All the cases that the state cites, all the cases that we cite under that Oregon versus Branshaw line of cases, every one of them involved a new Miranda waiver, full Miranda waiver. The one in Oregon versus Branshaw, Justice Powell was careful to point out, involved three separate Miranda waivers before the state went ahead and engaged in this re-initiated conversation. So, you know, it's just not the case from our perspective that all that you have to do is say, okay, I said I wanted to be done talking, but now I changed my mind. That's not what needs to happen. A knowing and valid waiver of all the Fifth Amendment rights as contemplated by Miranda. What do I got? 48? Okay. Mr. Harris, let me ask you a question. Are you familiar with Garza versus Idaho? Sir, refresh my. U.S. Supreme Court case, February of 2019. No, Your Honor. Okay. Go ahead and use your other seconds there. Okay. I'm sure Mr. Miller and I would both be happy to provide additional. I'm going to do that, but go ahead. Okay. I think that's it, Your Honors. Like I said, we commend all four issues to your adjudication, but focusing on these two, we ask for the court to reverse and remand for a new trial. Thank you. So as many of you who have appeared before me at least know, I'm a voracious student of the law. I read a lot of law cases for some reason. But I would like to offer you the opportunity to brief Garza versus Idaho, which is a Strickland standard case issued by Justice Sotomayor in February of 2019. And there's a bar review article on it. The citation is 139 Supreme Court 738. And there is some consideration of what effect this case is going to have as we go forward on the Strickland prongs, if you will. So what do you think? Justice Welch, what do you think, 14 minutes? Yeah, that's plenty. That's plenty. 14 minutes. Okay. Will that be sufficient? Can you at least look at the case and see if it has no applicability? If it has no applicability, don't waste your time. Just say we don't think it's applicable, and that's it. We don't want to read something that's made up. And I'm not saying it's applicable. I'm just raising it because I saw this bar journal article, and I read the case. And perhaps you want to look at it.  All right. Thank you both for your arguments. Can you repeat the name of the case again? It's Garza, G-A-R-Z-A versus Idaho, 139 Supreme Court 738. Okay. No problem. And just to finish that case, we'll take it under advisement then. Or we'll issue a due course. Okay.